## J. W. SWANN v. THE STATE.

### No. 1515.   Decided May 25, 1898.

**1.   Taking Record Papers Out of Courthouse—Practice.**

Article 270, RevisedStatutes, gives an attorney the right at all reasonable times to inspect papers, etc., and by permission of the clerk he may withdraw papers, leaving a descriptive receipt for the same.  Where counsel were afforded full opportunity to examine papers, the refusal of the court to permit them to take said papers from the courthouse will not constitute error where no possible injury is shown.

**2.   Manslaughter—Provocation—Charge.**

Where the court in the charge upon manslaughter instructed the jury that they could look to all the evidence in the case to find adequate cause, this sufficiently corrected a prior part of the charge which might have been construed as limiting the adequate cause to a provocation arising at the time of the homicide, and especially so where, if manslaughter was in the case at all, it was evidently based on the provocation arising at the time.

**3.   Self-Defense.**

Self-defense can rarely if ever consist in an aggressive movement at the inception of the difficulty, and a party will not be permitted to voluntarily seek a difficulty and put himself in a condition to be attacked, and then avail himself of the right of self-defense.  Where, after a wordy altercation, deceased got into his buggy and started off, and defendant's wife told him deceased was coming around the house to shoot him, whereupon he went into his room, got his gun, rushed out of the back door into the back yard, and shot the deceased in the back as he was still going off on his way in the buggy; Held, defendant showed no right of self-defense.

**4.   Murder in the Second Degree—Evidence Sufficient.**

See facts stated in the opinion which the court hold would have authorized the jury in assessing a graver degree and punishment than assessed by them.

APPEAL from the District Court of Washington.   Tried below before Hon ED. R. SINKS.

Appeal from a conviction for murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

Appellant was indicted for the murder of J. H. Foster by shooting him with a gun in Washington County, on the 9th day of October, 1897.

The case is fully stated in the opinion.

*Searcy & Garrett* and *W. H. Billingslea,* for appellant.—The court erred in refusing to permit W. H. Billingslea, the attorney representing the defendant on the trial below, to take to his office the charge of the court, charges asked and refused, bills of exceptions on file, and original motion for a new trial, in order that he might properly prepare an amended motion for a new trial and bill of exceptions in the case.

The Constitution guarantees to every person accused of crime the right to be heard and represented by counsel; and in order that he may be protected in this right, every facility should be allowed his attorney to properly present his case in the nisi prius court, and to prepare his record in order that it may be fully and intelligently presented in the upper court.

This is an absolute right and not a mere privilege granted to the defendant, that can be taken away or abridged by arbitrary rules established by the trial judge.

It is a most important as well as valuable right that the defendant's attorney have the papers in the case to properly prepare his record for appeal, for if the court has committed an error in his charge which is not excepted to at the time or called to his attention in the motion for new trial, this court is powerless to correct the error, it matters not how hurtful it may have been to the rights of the defendant. Bill of Rights, sec. 10; Code Crim. Proc., arts. 4, 819, 820; Roe v. State, 25 Texas Crim. App., 66; Walker v. State, 32 Texas Crim. Rep., 179; Babb v. State, 8 Texas Crim. App., 176.

The court erred in his charge on manslaughter in this: 1. The charge as given is in a negative form, and should have affirmatively applied the law to the facts of this case. 2. The charge is too restrictive in this, that it limits the "passion to the provocation then given, and it is not that the mind is merely agitated by passion arising from some other or previous provocation;" when the jury should have been told that they might consider what occurred at the time, in connection with what had occurred between the parties previously, in determining whether there was adequate cause to reduce the passion, such as defined by law, as would reduce the killing from murder to manslaughter.

In the trial of a murder case where the evidence, however inclusively, tends to prove facts from the which the jury may deduce a finding of manslaughter, it is incumbent on the trial court to give the law of manslaughter in charge to the jury, and it should be given affirmatively, directly, and pertinently to the theory of the case indicted by such evidence. Rippetoe v. State, 42 S. W. Rep., 381; Wadlington v. State, 19 Texas Crim. App., 275; Cochran v. State, 28 Texas Crim. App., 431; Neyland v. State, 13 Texas Crim. App., 549; McLaughlin v. State, 10 Texas Crim. App., 340; Johnson v. State, 43 Texas, 614.

The court erred in giving to the jury the following charge: "If you believe from the evidence that the defendant did with a gun shoot and thereby kill said J. H. Foster, and you further believe from the evidence that at the time of such killing said J. H. Foster made some demonstrations with a pistol that induced the defendant to believe, viewed from his standpoint at the time, that he was in danger of death or serious bodily injury, at the hands of said J. H. Foster, then you are instructed that the defendant had the right to act and kill the said J. H. Foster, and he would not be required to retreat in order to avoid the necessity of killing his assailant, and if you so find you will acquit the defendant."

1. The charge limits the right of defendant to defend himself only against actual danger, and does not permit him to defend himself against the appearance of danger.

2. The defendant is always justified in defending himself against the appearance of danger, and any act on the part of the deceased that would justify the defendant in believing at the time that his life was in danger, or that he was about to suffer serious bodily harm at the hands of the deceased, is sufficient to justify the defendant in taking the life of the party threatening him.

3.    There was no evidence in the case to the effect that deceased made any demonstration with a pistol at the time of the killing, and it was error for the court to limit the right of defendant to act in his defense only against some demonstration made by the deceased with a pistol at the time.   Cochran v. State, 28 Texas Crim. App., 422; Richardson v. State, 7 Texas Crim. App., 493; Horbach v. State, 43 Texas, 258; Babb v. State, 8 Texas Crim. App., 176.

The court erred in refusing to give to the jury the following special charges asked by the defendant:

"1.    If you believe from the evidence in this case that at the time the defendant shot at J. H. Foster the defendant believed and was justified in believing from the conduct and acts of J. H. Foster at the time he shot at him (if he did shoot at him) that it was necessary to shoot said James H. Foster to save his own life or to protect himself from serious bodily injury, the jury will return a verdict of not guilty.

"2.    It is not essential to the rights of self-defense that the danger should in fact exist.·  It may be only apparent and not real.  If it reasonably appears from the circumstances of the case that danger existed, the person threatened with such danger has the same right to defend against it and to the same extent that he would have were the danger real, and in determining whether there was reason to believe that danger existed, the appearance must be viewed from the standpoint of the defendant and from no other standpoint.  If to the defendant it reasonably appeared that the danger in fact existed, he had the right to defend against it, the same as if the danger had been real.  Each juror must place himself in the position of the defendant at the time of the assault and determine whether his apprehension or fear of death·or serious bodily injury was reasonable; if so, you are instructed to return a verdict of not guilty."

"4.    If from the evidence you believe that James H Foster by his own wrongful act, and words coupled with his acts, provoked the difficulty with the apparent intention of taking defendant's life, or of inflicting some great bodily harm upon his person, and at the time of the homicide the defendant from his standpoint had reasonable grounds to apprehend the danger threatened, whether the danger was real or only apparent, and did believe that his life was in danger, or that he was about to suffer some great bodily harm, shot the deceased, the law will justify his acts and you will acquit the defendant, and unless you are satisfied by the evidence beyond a reasonable doubt that the defendant was not justified under the circumstances above given, you will find the defendant not guilty."   Horbach v. State, 43 Texas, 258; Richardson v. State, 7 Texas Crim. App., 493; Marnoch v. State, 7 Texas Crim. App., 275; Brumley v. State, 21 Texas Crim. App., 222; Patillo v. State, 22 Texas Crim. App., 586; Bell v. State, 20 Texas Crim. App., 449; Rippetoe v. State, 42 S. W. Rep., 381.

*W. W. Walling* and *Mann Trice*, Assistant Attorney-General, for the State.   [No briefs found with the record.—Reporter.]

HENDERSON, JUDGE.— Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years, and prosecutes this appeal.

We will make a brief statement of the case in order to clearly present the several errors assigned. Deceased was an unmarried man, and owned a farm in Washington County, situated some six miles southeast of Chappel Hill. Appellant and his wife lived on the farm of the deceased, and seem to have been engaged in some business for deceased, though what is not stated. Deceased lived and boarded with appellant and his wife in the house occupied by them on his farm. A state of ill feeling existed between appellant and deceased for some weeks prior to the homicide, engendered from some disagreement in a settlement between them. The record on the part of the State shows that the defendant borrowed a gun from a neighbor, and had been carrying it for deceased for some week or more before the homicide. Appellant, however, denied this, and introduced evidence tending to show that he was carrying said gun for another party in the neighborhood who had burglarized his house some time before. In order to understand the testimony connected with the homicide, we insert the following diagram of the house and surroundings where the homicide occurred:

A is where the buggy was standing while Foster was at the steps talking to Swann.  P is where Foster stood talking to Swann.  B is the place where Foster's body was found; also where the buggy turned out of the road after the shooting.  C is where Swann stood when he shot Foster. 1 is Foster's room; 2 defendant's room; 3 the door out of which Swann came when he killed Foster.  The figures in the plat represent the various dimensions of the house and distances.

On the morning of the homicide Simpson and Foster were about starting to Chappel Hill.  They had harnessed the horse to the buggy of the deceased, and the horse and buggy were standing just in front of the house.  Appellant was sitting on the gallery, and his wife was standing near by.  According to the State's testimony, just before leaving, deceased, who was standing front of the gallery, with his foot on the step, said to Swann, "I want to see you."  Swann replied, "My time is important."  Foster then said, "I have been trying to have a talk with you for several days; I want to speak with you privately."  Swann replied, "Why do you want to speak to me privately?"  Foster replied, "Because I don't want to hurt your wife's feelings."  Swann said, "I don't want to talk to you."  Foster then said, "Swann, I want you to vacate my house." Swann replied, "I will vacate your house when you pay me what you owe me."  Foster said, "I have paid you all I owe you; besides, who broke our contract?"  Swann replied, "You did."  Foster said, "You are a damn liar."  Simpson, who was standing near by, then said to Foster that "it is time we were going," and he and Foster then got in the buggy and started off; Foster being on the right side, and Simpson riding on the side next to the house.  They elbowed around the house, going east; then down the road north, towards the gin.  They had proceeded about thirty-three yards toward the gin, when appellant came out of his back door with his shotgun, and shot deceased, the shot taking effect in the back of deceased's head, side of his left jaw, and in his back near his shoulder.  He fell out on the left side of the buggy.  Simpson immediately got out of the buggy, and soon others, who were near by, came up.  Two or three witnesses saw the shooting.  They testified substantially as did Simpson. Appellant and his wife both testified in the case, and they testify as to what occurred at the house just before the difficulty, substantially as did Simpson, except they state that when appellant declined to talk privately with the deceased, at his suggestion that he did not desire to hurt his wife's feelings on account of his respect for her, that deceased replied, "By God, I want my house and I want you to get out."  Appellant then told him he would have to pay him his money on his contract before he got out, and told deceased that he had broken the contract, and deceased replied, "You are a damn liar."  That appellant then replied, "That is all right," and deceased told him he would see that he got out of the house at once.  They then state that deceased and Simpson got in the buggy. (While deceased was talking to the appellant he had his hand on his pistol.)  The appellant's wife then looked out, and said, "Foster is coming around the house to shoot you."  Appellant looked, and saw Simpson and

Foster driving around the house in the buggy. That he then went in his room, got his gun, rushed out the back door into the back yard, and he saw Foster pushing Simpson down in the buggy with his left hand, his right hand in his bosom, and at that instant he raised his gun and fired. The horse in the buggy reared, and Foster fell from the buggy on his face. That, just as he raised his gun, Foster turned his face from him as he fired, and as he fell from his buggy he had his pistol in his hand, and after he fell out of the buggy he walked up to within a few feet of the body, and he and his wife both saw the pistol lying nearly under Foster on the ground. That he called his wife's attention to it. As stated, his wife substantially agrees with this version of the shooting. He explained that he went out the door into the back yard to defend himself, because his wife told him that deceased was coming around behind the house towards the back door to shoot him. Mrs. Swann testified that Schultz was the first person to reach the body of the deceased, and he picked up Foster's pistol, and put it in the waistband of his pants. Schultz denies this. Simpson, and two or three witness for the State, who came up immediately, testified that deceased's pistol was in the waistband of his pants, on his left side; that he was lying on his back. Appellant and his wife testified that he fell on his face. Simpson, who was present, and two or three other State's witnesses, who saw the shooting of the deceased, all testify that deceased made no demonstration whatever, and it is unquestioned that the shots from appellant's gun struck defendant in the rear. A shot in the left jaw, which struck near the base of the jaw, and came out under the right eye, was more in front than any shot received. The State's witnesses testified that the road traveled by deceased from the time he got in the buggy until he was shot was the traveled road from the house to the gin, and on to Chappel Hill, and that the buggy, up to the time of the firing, pursued the road; that at the time deceased was shot he had his head turned rather sidewise, to the left, talking to Simpson. Appellant and his wife testified that Simpson, about the time of the firing, was pulling the horse in towards the left of the road. The road in question, after running a few steps south, elbowed around the house, and then pursued an easterly course, diverging gradually from the house. Deceased had passed the house about twenty yards when he was shot. These are substantially all the facts necessary to be stated in order to consider the assignments of error.

Appellant assigns as error the action of the court in refusing to permit his counsel, after the trial of the case, to take out of the courthouse the papers in the cause, consisting of the charge of the court and refused charges, which he claimed he had a right to do, in order to properly prepare his motion for a new trial. The court explains this bill by stating that he had made a rule at some previous term of the court prohibiting the carrying from the courthouse of such papers, and that he informed counsel for defendant that he did not desire to make a breach of said rule, but that he would give him the amplest facilities for examining said papers; that he could retire with them to the room of the judge, which

was in the courthouse, and examine them at his leisure. It appears that counsel refused to do this, and reserved his bill of exceptions. Counsel insists that this action of the court was calculated to embarrass him in the preparation of his motion for a new trial, not having ample facilities in the courthouse to make a proper investigation, and not having books convenient at that point for reference. The only statute we find bearing on this subject is article 270, Revised Civil Statutes, as follows: "Each attorney at law, practicing in any court, shall be allowed at all reasonable times to inspect the papers and records relating to any suit or other matter in which he may be interested without being required to take copies thereof; but no person whatever shall be allowed to take any papers out of the office to which they belong without the permission of the clerk or keeper of the records; and the party withdrawing said papers shall leave a descriptive receipt for the same." This statute would seem to apprehend that every attorney may, at all reasonable hours, inspect the papers in any cause in which he may be interested. But there appears to be a limitation on the right to withdraw papers from the court or custody of the clerk, as this can be done alone on permission of the clerk, and then he must leave a descriptive receipt of such papers. It would appear that, if the clerk is authorized to grant permission, he can withhold permission to withdraw papers from his custody. He could not, however, decline to permit an inspection of such papers or the making of copies thereof. But, whatever may be the construction of this statute, we would not feel authorized to reverse a case unless it clearly appeared that, by the refusal of the clerk or court to allow papers to be withdrawn from custody, the appellant had suffered injury. Now, the only papers necessary to be used by him in preparing his motion for a new trial were the charge of the court and the refused charges. The court offered him full opportunity and facility to examine these in his private room, and, if he desired, of course he had the opportunity of making copies thereof. And in this connection we would observe that appellant utterly fails to show how the action of the court could possibly have injured him.

Appellant complains that the court's charge on manslaughter was too restrictive, in that it limited the defense of manslaughter to some provocation arising at the time. It is true, in one part of the charge, in defining the elements of manslaughter, the court told the jury that the provocation must arise at the time of the homicide, and must not be the result of some former provocation. The court, however, further told the jury, in applying the law to the evidence, that they could look to all the evidence in the case to find adequate cause. If there was manslaughter in this case at all, which is doubtful, we think that it was evidently based on the provocation arising at the time. True, there was bad feeling existing between the parties previous to that time, but all the acts upon which this defense could be possibly based occurred at the time of the homicide, while deceased and appellant were talking at the gallery. Deceased asked appellant to let him see him privately, that he did not want

to hurt his wife's feelings. Appellant told him to go ahead, and seemed to be disregardful of his own wife's feelings; and then deceased, according to appellant's own testimony, told him that he wanted him to get out of his house, and in the altercation with reference to a settlement between them, and the statement by appellant that deceased owed him, deceased replied that it was a "damn lie." This, if anything, was the provocation, and the only provocation, we have been able to discover in the case. This provocation occurred at the time, and was brought on by appellant in refusing to permit deceased to speak with him privately about getting off of his premises. As stated above, it is exceedingly doubtful that there is any manslaughter in this case. If appellant's passion was excited, it occurs to us that he would have gotten his gun immediately, while deceased was insulting him, before he got in his buggy, and shot him down. Instead thereof, he waited until deceased got in his buggy, is driving off, and then got his gun and shot him in the back. It is not claimed that this was an insult to appellant's wife (which it was not), but merely insulting language by deceased to appellant, and the statute expressly provides that insulting language is not adequate cause.

Appellant assigns as error the charge of the court on self-defense. He claims that the charge of the court limited the right of appellant to act in self-defense to a demonstration made by deceased with a pistol which induced defendant to believe that his life or person was in danger, etc.; and he insists that the evidence does not show any demonstration with a pistol, but merely shows that deceased put his hand in his bosom, and that he should have had the full benefit of a charge on the appearance of danger. Both appellant and his wife testified that they saw deceased with a pistol at the gallery. It was then in the waistband of his pants. They both testify that at the juncture of the firing of the fatal shot appellant ran his hand in his bosom. How this could be considered by them a demonstration as if to draw a pistol from the waistband of his pants is remarkable. But they testified that just as the gun fired they saw the pistol in his hand, and he fell out of the buggy with it in his hand. (Of course, this is denied by the State's witnesses in the case; and a number of the State's witnesses, who were disinterested, testified that they saw deceased immediately, and the pistol was still sticking in the waistband of his pants.) But, concede that the testimony of the defendant and his wife is true, this demonstration was with a pistol, and simultaneous with the firing they saw it in his hand. If he did not have the pistol in his hand, to which they swear, the fact that he put his hand in his bosom could be no demonstration on his part at all, because they knew his pistol was in the waistband of his pants. But more than this, from the testimony of the defendant and his wife upon whom he relies for self-defense, he is entirely cut off from that defense. Self-defense can rarely, if ever, consist in an aggressive movement at the inception of the difficulty. Certainly a party will not be permitted to voluntarily seek a difficulty, and put himself in condition to be attacked, and then avail him-

self of the right of self-defense. Suppose it be true that appellant's wife said to him that "deceased is coming in at the back door to attack you;" did that authorize appellant to rush out of his back door and shoot deceased, who he saw was not then coming in at his back door, but was driving off in his buggy? It occurs to us, if the testimony of the defendant be true on this issue, that, at most, it authorized appellant to arm himself with his gun, stand his ground in his own house, and, if he saw deceased attempting to enter it or to make an attack upon him, then, and then only, did he have a right to shoot him. When he went to the door he could see the buggy was being driven away, and there is no pretense that he saw deceased in the act of getting out or attempting to get out of the buggy to come into his house; and, under the circumstances of this case in proof by his own witnesses, he was not authorized to rush out into his back yard and shoot deceased in his buggy. As soon as he saw that no attempt was being made on the part of deceased to leave the buggy, and to enter appellant's back door, from which he was then about thirty yards, he at once knew that his wife was mistaken in her statement that he was coming in at the back door to attack him, and his shooting appellant in the back under such circumstances was making a travesty of the right of self-defense. If the right of self-defense can be exercised under such circumstances, then any man who has been cursed or denounced by his adversary, and that adversary leaves the place, and unsuspectingly goes on his way, can be waylaid and shot in the back without warning, and yet it can be claimed that he had a right to do it because he was then in danger. The right of self-defense has no such latitude as this. In what we have said we have treated the question from the standpoint of the defendant, based on his testimony. Of course, when we come to view the matter from the testimony on the part of the State, the proposition of defendant that what he did was in self-defense appears absurd.

Appellant complains that the court should have charged on accomplice testimony with reference to the witness Simpson. We see nothing in the record on which to base this contention.

Nor was there any error on the part of the court in refusing to permit the introduction of testimony offered by appellant in regard to what appellant's wife found in the coat pocket of the deceased. The deceased was not privy to this, and if she took undue advantage to obtain his property, consisting of obscene pictures, etc., from his pocket, without his knowledge, it was no fault of the deceased. If there was any error in this matter, it was in the court admitting testimony with regard to deceased having given to the wife of appellant some time previous to the homicide a package of candy, and what he said to her on that occasion. This was not communicated to appellant, and had nothing to do with his acts or conduct. We have examined the statement of facts carefully, and, in our opinion, the jury would have been authorized in assessing a graver punishment against the appellant than the penalty they did, for, in the

light of the evidence, it was nothing less than an assassination. No reversible error appearing in the record, the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]